UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA | |
| v. | No. 18 CR 00458 |
| REGGIE JOHNSON | Judge Thomas M. Durkin |

**MEMORANDUM OPINION AND ORDER**

Defendant Reggie Johnson has filed motions to dismiss the indictment in his criminal case, which charges him with two violations of possession of a firearm by a convicted felon under 18 U.S.C. § 922(g)(1), among other crimes. R. 191. First, he lodges a facial and as-applied challenge to § 922(g)(1), arguing that the statute violates his Second Amendment right to keep and bear arms under the analytical framework recently articulated by the United States Supreme Court in *New York State Rifle & Pistol Ass'n v. Bruen*, 597 U.S. ----, 142 S. Ct. 2111 (2022). Second, Johnson moves to dismiss the indictment pursuant to Fed. R. Crim. P. 12(b)(1) on allegations of police misconduct. R. 198. For the following reasons, both motions [191, 198] are denied.

**I.  *Bruen* Motion**

**a.  Relevant Background**

Johnson's criminal record prior to this case includes felony convictions under Illinois law for battery, delivery/possession with intent to deliver less than five grams of methamphetamine, possession with intent to deliver a controlled substance, and

1

possession of a controlled substance. R. 204 at 4. Therefore, Johnson is prohibited from possessing a firearm under § 922(g)(1).

The superseding indictment states that, in two separate incidents on June 16 and December 4, 2017, police officers encountered Johnson in possession of a firearm and heroin. R. 193. As a result, Johnson was charged with two counts of being a felon in possession of a firearm under § 922(g)(1). *Id.* He was also charged with possession with intent to distribute heroin under 21 USC § 841(a), possession of a firearm in furtherance of a drug-trafficking crime under 18 USC § 924(c), and possession of a controlled substance under 18 USC § 844. *Id.* Johnson pled guilty to the charges pertaining to his December 4, 2017 conduct and intends to proceed to a jury trial on the June 16, 2017 conduct. R. 200.

Johnson moves to dismiss the indictment because he alleges that the felon in possession charges against him pursuant to § 922(g)(1) are unconstitutional under the Second Amendment.[1] R. 191. Like the numerous similar motions filed in this District and around the country, he alleges that the government cannot bear its burden to show that § 922(g)(1), on its face and as applied to him (allegedly a non-violent felon), is "consistent with this Nation's historical tradition of firearm regulation." *Bruen*, 142 S. Ct. at 2126.

### b. Discussion

#### i. Second Amendment Jurisprudence

---

[1] Johnson's motion to dismiss applies to both § 922(g)(1) charges, including the one to which he pled guilty.

2

The Second Amendment to the United States Constitution states: "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." In *District of Columbia v. Heller*, the Supreme Court clarified that the Second Amendment guarantees the right of "law-abiding, responsible citizens" to keep and bear arms for self-defense. 554 U.S. 570, 635 (2008). The Supreme Court extended *Heller*'s holding to regulations promulgated by state and local governments in *McDonald v. City of Chicago*, 561 U.S. 742, 786 (2010).

The Supreme Court's most recent Second Amendment case, *Bruen*, established an analytical framework that courts must follow in assessing the constitutionality of firearm regulations. 142 S. Ct. at 2126. In rejecting a New York law that required residents to demonstrate "proper cause" for a license to carry a firearm, the Court declined to apply an interest-balancing test (the "means-end" analysis) adopted by this Circuit and others. *Id.* at 2127 ("Despite the popularity of this two-step approach, it is one step too many."). Instead, the Court held that the proper inquiry is whether the regulation is "consistent with the Second Amendment's text and historical understanding." *Id.* at 2131. At the outset, if the Second Amendment's plain text covers an individual's conduct, the conduct is "presumptively protect[ed]." *Id.* at 2129–30. "The government must then justify its regulation" of that conduct "by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation." *Id.* at 2130.

The government may do this by providing evidence of distinctly similar historical regulations addressing a societal problem that has existed since the Eighteenth Century (called a "straightforward historical inquiry"). *Id.* at 2131. Recognizing that modern societal and technological issues are not necessarily the same as those faced by the Framers or Reconstruction generation, the *Bruen* Court also acknowledged that courts could adopt a "more nuanced approach" and consider "historical analogies" to determine whether the challenged regulation is "relevantly similar" to historical restrictions. *Id.* at 2132. "Central considerations" to this inquiry include "whether modern and historical regulations impose a comparable burden on the right of armed self-defense and whether that burden is comparably justified." *Id.* at 2132–33 (quoting *McDonald*, 561 U.S. at 767). The Court cautioned that this approach should neither be a "regulatory straightjacket nor a regulatory blank check." 142 S. Ct. at 2132. That is, any law that "remotely resembles a historical analogue" should not be automatically upheld, but the government is also not required to find a historical "twin" or a "dead ringer." *Id.* (quoting *Drummond v. Robinson*, 9 F.4th 217, 226 (3d Cir. 2021)).

*Bruen* set off a flurry of filings across the country challenging various firearms regulations, including, most notably, challenges to the federal felon-in-possession statute, 18 U.S.C. § 922(g)(1). Section 922(g)(1) has been upheld under *Bruen* by nearly every court that has considered the question. At the time of the government's response brief, one federal court of appeals and 174 federal district courts, including six judges in this District, had upheld § 922(g)(1) as constitutional under *Bruen*. R.

4

204-1 (collecting cases); *see also, e.g.*, *United States v. Jackson*, 69 F.4th 495, 505 (8th Cir. 2023) (holding that *Bruen* did not disturb the Supreme Court's prior "assurances" that felon in possession laws are constitutional, and finding "considerable support in the historical record" that the Nation has historically disarmed persons who are "deemed more dangerous than a typical law-abiding citizen."); *United States v. Gates*, No. 1:22-CR-00397-1, 2023 WL 5748362, at *9 (N.D. Ill. Sept. 6, 2023) (Chang, J.) (holding that, although felons are presumptively considered part of the "people" under the text of the Second Amendment, disarming groups understood to be dangerous was part of the nation's historical tradition).

There are two outliers: first, in *Range v. Atty. Gen. United States of Am.*, the Third Circuit sitting *en banc* held § 922(g)(1) was unconstitutional as applied to a person with a single 1995 misdemeanor[2] of making a false statement to obtain food stamps. 69 F.4th 96, 103 (3d Cir. 2023). It found a lack of "longstanding history and tradition of depriving people *like Range* of their firearms." *Id.* at 106 (emphasis added). Similarly, a Southern District of Mississippi court granted a defendant's as-applied challenge to the felon-in-possession statute because the government failed to "establish a historical tradition supporting lifetime criminalization of [that defendant's] possession of a firearm." *United States v. Bullock*, No. 3:18-CR-165-

---

[2] Though it is often referred to as the felon-in-possession law, § 922(g)(1) applies to crimes "punishable by imprisonment for a term exceeding one year," and only excepts misdemeanors "punishable by a term of imprisonment of two years or less." 18 U.S.C. § 921(a)(20)(B). The misdemeanor on Range's record was an anomaly in that a sentence of imprisonment of up to five years was authorized, such that § 922(g)(1) still applied to bar Range from obtaining a firearm. *See Range*, 69 F.4th at 98.

CWR-FKB, 2023 WL 4232309, at *31 (S.D. Miss. June 28, 2023). In both cases, the courts emphasized their holdings were narrowly limited to the defendants in those cases. *Id.* ("[T]he charge against him, and him only, should be dismissed . . . In plain English, that means that the charge against Mr. Bullock will be dismissed today, and the federal government may continue to prosecute other persons for violating § 922(g)(1)."); *Range*, 69 F.4th at 106 (stating that the holding is "narrow," applying "only" to Range, given the single non-violent misdemeanor on his record).

The Seventh Circuit, in its recently issued opinion in *Atkinson*, acknowledged that *Bruen* abrogated its prior Second Amendment analytical test, and that the government must now defend the constitutionality of firearm regulations under the *Bruen* framework. *Atkinson v. Garland*, 70 F.4th 1018, 1019 (7th Cir. 2023) (citing *Bruen*, 142 S. Ct. at 2126–27). It remanded a pre-*Bruen* challenge to § 922(g)(1) to the district court for further briefing and analysis under *Bruen* and laid out a number of considerations for district courts to weigh in conducting that analysis. *Id.* at 1023–24. Judge Woods' dissent explained that she would have upheld § 922(g)(1) as constitutional without requiring remand. *Id.* at 1025–38. In doing so, she identified an array of historical analogies. *Id.* at 1033–36. As it stands, however, the Seventh Circuit has not yet definitively ruled on the constitutionality of § 922(g)(1) under *Bruen*.[3]

---

[3] In *Kanter v. Barr*, 919 F.3d 437 (7th Cir. 2019), the Seventh Circuit ruled that § 922(g)(1) did not violate the Second Amendment under the means-end analysis, which was rejected by the Supreme Court in *Bruen*. It is therefore no longer controlling.

The Court proceeds to address Johnson's motion by applying the *Bruen* factors: first, whether the Second Amendment's plain text covers § 922(g)(1); and second, whether § 922(g)(1) is consistent with the Nation's historical tradition of firearm regulation.[4]

### ii. The Second Amendment's Plain Text

The plain text of the Second Amendment grants the right to bear arms to "the people." U.S. Const. amend. II. According to Johnson, every person—even a felon—is part of "the people" who hold the Second Amendment right. Consequently, Johnson argues that his carrying of a firearm for self-defense is presumptively protected. The government, meanwhile, argues that the Supreme Court has been clear that the text of the Second Amendment applies only to "law abiding, responsible citizens." *See, e.g.*, *Bruen*, 142 S. Ct. at 2131 (quoting *Heller*, 554 U.S. at 635).[5]

Despite the numerous reiterations of the term "law-abiding, responsible citizens" by the Supreme Court in its *Heller* and *Bruen* majority and concurring opinions, it has never addressed whether the plain text of the Second Amendment excludes felons. These dicta were in cases where the issue of felons was not before the Court, let alone the issue of the Second Amendment's textual scope with respect to felons. And these statements were not meant to define the term "the people," but rather, opined on the circumstances in which the legislature could and could not

---

[4] Neither party presents expert testimony or evidence, challenges the authenticity of the historical sources presented, nor requests a hearing.

[5] The government further cites a number of third-party sources on the rights historically accorded to felons, but these sources are best utilized in the context of the second prong of the analysis.

regulate the right. *United States v. Meza-Rodriguez*, 798 F.3d 664, 669 (7th Cir. 2015) (Pre-*Bruen*, holding that the "law-abiding, responsible citizens" language in *Heller* was not meant to define the term "the people."). Moreover, in *Atkinson*, the Seventh Circuit directed district courts to begin with analysis of the Second Amendment's plain text, finding that the Supreme Court had not settled the issue. 70 F.4th at 1023 (declining to rule on the issue of whether the plain text of the Second Amendment covers a felon's right to carry firearms).

Furthermore, in *Heller*, the Supreme Court declared a "strong presumption that the Second Amendment right . . . *belongs to all Americans*." 554 U.S. at 581 (emphasis added). It also discussed that the term "the people" appears throughout the Bill of Rights, for example, in the First, Second, and Fourth Amendments, and that it reflects a consistent reference to individual, rather than collective rights (i.e., as part of a militia). *Id.* at 579. It follows that, since felons are not excluded from First or Fourth Amendment rights, neither should they be excluded from Second Amendment rights, given the Framer's consistent use of the term "the people" throughout. If "the people" excludes felons, "then all *other* constitutional-rights provisions that use the word 'people' would *categorically* remove felons outside of the protection of the pertinent right." *United States v. Gates*, 2023 WL 5748362, at *4 (N.D. Ill. Sept. 6, 2023). But that is not true. For example, a convicted felon such as Johnson still has a Fourth Amendment right to be free from unlawful searches and seizures, as he alleged in earlier litigation in this case. There is no reason in the text of the Constitution to think that the phrase "the people" does not cover, on its face,

8

all persons—including a person convicted of a felony. The question then becomes when that right can be constitutionally restricted by the legislature. *See Kanter*, 919 F.3d at 453 (Barrett, J., dissenting) ("Neither felons nor the mentally ill are categorically excluded from our national community. That does not mean that the government cannot prevent them from possessing guns. Instead, it means that the question is whether the government has the power to disable the exercise of a right that they otherwise possess, rather than whether they possess the right at all.").

In the end, the plain text analysis is not dispositive because even if the Second Amendment's plain text covers Johnson's conduct, his challenge to § 922(g)(1) fails under the second prong of the *Bruen* analysis. That is, § 922(g)(1) falls comfortably within the Nation's historical tradition of disarming categories of people considered to be dangerous and is thus constitutional both generally and as applied to Johnson.

### iii. The Nation's Historical Tradition of Firearm Regulation

Even if felons are considered part of "the people" whose right to bear arms is "presumptively protect[ed]," *Bruen*, 142 S. Ct. at 2126, the Supreme Court has been clear that regulatory schemes disenfranchising felons of those rights presumably pass constitutional muster. In *Heller*, for example, the Court stated that the Second Amendment guarantees the right to keep and bear arms for self-defense, 554 U.S. at 635, subject to "*presumptively lawful* regulatory measures," *id.* at 627 n.26 (emphasis added), including "longstanding prohibitions on the possession of firearms by felons," *id.* at 626. And again, in *McDonald*, the majority stated that *Heller* "did not cast doubt on such longstanding regulatory measures as 'prohibitions on the possession of

firearms by felons.'" 561 U.S. at 786 (quoting *Heller*, 554 U.S. 626). Though these were largely hypothetical predictions about what the Supreme Court might ultimately hold, they are persuasive.

And though the phrase "law abiding, responsible citizens" is not meant to define "the people" who hold Second Amendment rights, it is helpful to understanding who the Supreme Court believes the legislature may or may not restrict from exercising those rights. Indeed, the *Bruen* opinion reiterates the phrase "law abiding, responsible citizens" no fewer than fourteen times. *See, e.g.*, *id.* at 2131 ("The Second Amendment . . . 'surely elevates above all other interests the right of law-abiding, responsible citizens to use arms' for self-defense." (quoting *Heller*, 554 U.S. at 635)), 2133 (". . . how and why the regulations burden a law-abiding citizen's right to armed self-defense."), 2138 n.9 (discussing that shall-issue licensing regimes are unaffected by the Court's holding because they "are designed to ensure only that those bearing arms in the jurisdiction are, in fact, 'law-abiding, responsible citizens.'" (quoting *Heller*, 554 U.S. at 635)), 2156 ("New York's proper-cause requirement violates the Fourteenth Amendment in that it prevents law-abiding citizens . . . from exercising their right to keep and bear arms."). Justice Alito's and Justice Kavanaugh's concurrences explicitly recognized that nothing in that opinion was meant to disturb "anything the Court said in *Heller* or *McDonald* about restrictions that may be imposed on the possession or carrying of guns," *id.* at 2157 (Alito, J., concurring), and that "longstanding prohibitions on the possession of firearms by felons" remains constitutional, *id.* at 2162 (Kavanaugh, J., concurring). *See also id.* at 2189 (Breyer,

J., dissenting) ("I understand the Court's opinion today to cast no doubt on" the language in *Heller* that felon-in-possession laws are "presumptively lawful.").

Nonetheless, the Seventh Circuit in *Atkinson* declined to use this "oft-quoted dicta" to "sidestep *Bruen*" in deciding a Second Amendment challenge to § 922(g)(1). 70 F.4th at 1022. It directed district courts to conduct a fulsome analysis, and to consider the following considerations:

> 1. Does § 922(g)(1) address a "general societal problem that has persisted since the 18th century?" *Bruen*, 142 S. Ct. at 2131. If this problem existed during a relevant historical period, did earlier generations address it with similar or "materially different means?" *Id.*

> 2. What does history tell us about disarming those convicted of crimes generally and of felonies in particular? Among other sources, the parties could look to commentary from the Founders, proposals emerging from the states' constitutional ratifying conventions, any actual practices of disarming felons or criminals more generally around the time of the Founding, and treatment of felons outside of the gun context (to the extent this treatment is probative of the Founders' views of the Second Amendment). When considering historical regulations and practices, the key question is whether those regulations and practices are comparable in substance to the restriction imposed by § 922(g)(1). To answer the question, the district court and the parties should consider how the breadth, severity, and the underlying rationale of the historical examples stack up against § 922(g)(1).

> 3. Are there broader historical analogues to § 922(g)(1) during the periods that *Bruen* emphasized, including, but not limited to, laws disarming "dangerous" groups other than felons? The parties should not stop at compiling lists of historical firearms regulations and practices. The proper inquiry, as we have explained, should focus on how the substance of the historical examples compares to § 922(g)(1).

> 4. If the district court's historical inquiry identifies analogous laws, do those laws supply enough of a historical tradition (as opposed to isolated instances of regulation) to support § 922(g)(1)? On this front, the parties should provide details about the enforcement, impact, or judicial scrutiny of these laws, to the extent possible.

5. If history supports Atkinson's call for individualized assessments or for a distinction between violent and non-violent felonies, how do we define a non-violent or a non-dangerous felony? And what evidence can a court consider in assessing whether a particular felony conviction was violent? . . .

*Id.* at 1023–24. The Court examines each of these factors in turn.

### 1. Whether Section 922(g)(1) Addresses a "General Societal Problem that has Persisted since the Eighteenth Century."

First, the government acknowledges that the issues of felons and recidivism generally have existed since the founding, and that the government has long considered how it could disarm individuals who, like felons, are deemed untrustworthy adherents to the rule of law. Under this framework, the Court is required to conduct the "straightforward historical inquiry" that requires the government to cite evidence of "distinctly similar historical regulation[s] addressing that problem." *Bruen*, 142 S. Ct. 2129. The government here provides analysis of felon punishment laws showing materially similar treatment, but also provides other historical analogies of how the government disarmed "dangerous" or "untrustworthy" groups.

### 2. What History Tells Us About Disarming Those Convicted of Crimes Generally and of Felonies in Particular.

History demonstrates that felonies have always been regarded as the most serious crimes, subject to punishments that subsumed a stripping of one's right to bear arms. Under English common law and early American criminal law, convicted felons were subject to capital punishment and/or complete estate forfeiture (lands and

goods, including, presumably, one's firearms). *Baze v. Rees*, 553 U.S. 35, 94 (2008) (Thomas, J., concurring) (citation omitted) (In the 18th Century, capital punishment was "the standard penalty for all serious crimes."); *Medina v. Whitaker*, 913 F.3d 152, 159 (D.C. Cir. 2019) (discussing estate forfeiture laws around the founding). The government provides numerous examples of such punishments, including laws that authorized these punishments for non-violent crimes, such as forgery, embezzlement, and arson.

Further, throughout history, legislatures have stripped from felons certain rights as a consequence of their convictions. Thomas Cooley, *A Treatise on the Constitutional Limitations Which Rest Upon the Legislative Power of the States of the American Union* 28-29 (1868) (in describing the right to vote, stating that "[c]ertain classes have been almost universally excluded"—including "the idiot, the lunatic, and the felon, on obvious grounds."); *see also Medina*, 913 F.3d at 160 (discussing 28 U.S.C. § 1865(b)(5), which bars convicted felons from serving on a federal jury); *Richardson*, 418 U.S. at 56 (upholding state felon disenfranchisement); *Spencer v. Kemna*, 523 U.S. 1, 8-9 (1998) (noting that consequences of a felony conviction can include deprivation of the right to hold office). The right to bear arms has always been regarded similarly—it can constitutionally be limited to "law-abiding, responsible citizens." *Heller*, 554 U.S. at 626 ("[N]othing in our opinion should be taken to cast doubt on longstanding prohibitions on the possession of firearms by felons[.]"), 635; *see also United States v. Yancey*, 621 F.3d 681, 684–85 (7th Cir. 2010) (*per curiam*) ("[M]ost scholars of the Second Amendment agree that the right to bear arms was

tied to the concept of a virtuous citizenry and that, accordingly, the government could disarm 'unvirtuous citizens.'"); *United States v. Carpio-Leon*, 701 F.3d 974, 980 (4th Cir. 2012) (Historically, "felons were excluded from the right to arms because they were deemed unvirtuous."(cleaned up)); *United States v. Bena*, 664 F.3d 1180, 1183 (8th Cir. 2011) ("In classical republican philosophy, the concept of a right to arms was inextricably and multifariously tied to that of the virtuous citizen, such that the right to arms does not preclude laws disarming the unvirtuous (i.e. criminals)."); *United States v. Vongxay*, 594 F.3d 1111, 1118 (9th Cir. 2010) (same).

The government cites three proposed precursors to the Second Amendment from the ratification debates, all of which explicitly limited the right to bear arms by commission of crimes. *See*, *e.g.*, 2 Bernard Schwartz, *The Bill of Rights: A Documentary History* 665 (1971) (Pennsylvania Antifederalists' proposed precursor to the Second Amendment, which read: "[N]o law shall be passed for disarming the people . . . *unless for crimes committed*, or real danger of public injury from individuals." (emphasis added)). Although they were not adopted, these proposals further reflect the Founders' acceptance of the idea that the government could disarm criminals. *See* Stephen P. Halbrook, *The Founders' Second Amendment* 273 (2008) (concluding that the power to restrict criminals from the right to bear arms was understood and accepted in the 1700s, even if not explicitly stated in the Second Amendment's text).

Johnson argues that the government has not carried its burden to show evidence of any explicit felon firearm dispossession law prior to the 1930s[6] and argues that this silence is evidence that the early-American society did not approve of such a regulation. He further argues that the felony punishment laws of the 18th Century did not result in permanent disarmament, but, by their silence, left open the possibility of the felon attaining arms in the future once he had fulfilled his sentence.

Though not explicitly mentioning disarmament, sentences such as the death penalty and total forfeiture of one's land and possessions (which would include firearms) assume that one would lose the ability keep and bear firearms. *Medina*, 913 F.3d at 158; *see also Jackson*, 69 F.4th at 503 (noting that early legislatures "authorized punishments that subsumed disarmament—death or forfeiture of a perpetrator's entire estate—for non-violent offenses[.]"). And although "the existence of the death penalty is not a license to the Government to devise any punishment short of death within the limit of its imagination," *Trop v. Dulles*, 356 U.S. 86, 99 (1958), the practical upshot of such laws is "distinctly similar" in that they resulted in disarmament. *Bruen*, 142 S. Ct. at 2131 (The government need not present a perfect historical "twin.").

### 3. Broader Historical Analogs to Section 922(g)(1).

---

[6] The Federal Firearms Act, passed in 1938, was the first known blanket ban on felons obtaining firearms, and it only banned felons convicted of certain violent crimes. *United States v. Skoien*, 614 F.3d 638, 640 (7th Cir. 2010) (citing c. 850, § 2(f), 52 Stat. 1250, 1251 (1938)). Section 922(g)(1) was passed in the 1960s. *Id.* (citing Pub. L. 87-342, 75 Stat. 757).

The government has also presented numerous examples of broader historical analogs demonstrating that, under English common law, colonial law, and early American law, prohibitions on the right to bear arms by groups deemed "dangerous" or "untrustworthy" were common and accepted practice. First, categorical prohibitions appeared in the English precursor to the Second Amendment, the 1689 English Bill of Rights. *See* 1 W. & M., Sess. 2, c. 2, in 6 *The Statutes of the Realm* 143 (1688) ("Protestants may have Arms for their Defence suitable to their Conditions and as allowed by Law."); *see also Heller*, 554 U.S. at 599 (The Second Amendment "was not intended to lay down a novel principle but rather codified a right inherited from our English ancestors."). The English government saw certain groups (such as Catholics and non-conforming Protestants) as a whole as untrustworthy to obey the law because they refused to swear allegiance to the Crown. *Range*, 69 F.4th at 120–22 (Krause, J., dissenting); *see also Jackson*, 69 F.4th at 502; *Kanter*, 919 F.3d at 456–58 (Barrett, J., dissenting).

During the colonial period, many of the American colonies followed England's example in disarming religious minorities because they were seen as unwilling to adhere to the King's commands. *See Range*, 69 F.4th at 123–24. More enlightening is the fact some colonies specifically disarmed "free, Christian, white men," "whom the authorities believed could not be trusted to obey the law." *Range*, 69 F.4th 96 at 122 (Krause, J., dissenting) (citing Nicholas J. Johnson et al., *Firearms Law and the Second Amendment: Regulation, Rights, and Policy* 174 (3d ed. 2022)). For example, Massachusetts disarmed the followers of Anne Hutchison, a dissident preacher.

16

*Range*, 69 F.4th at 123 (Krause, J., dissenting) (citing Edmund S. Morgan, *The Case Against Anne Hutchinson*, 10 New Eng. Q. 635, 637-38, 644, 648 (1937), among other sources). Hutchison's followers were disarmed because authorities believed her supporters could not be trusted to obey the law, even though the colonial charters provided broad protections for the right to firearms. *Range*, 69 F.4th at 122 (Krause, J., dissenting).[7]

Moreover, during the Revolutionary War era, the fledgling American governments recommended or passed numerous disarmament laws targeting those who failed to demonstrate loyalty to the American cause. *See, e.g.*, *The Public Records of the Colony of Connecticut From May, 1775 to June, 1776*, at 193 (1890) (1775 Connecticut law disarming those who libeled any acts of the Continental Congress or Connecticut General Assembly); 4 *Journals of the Continental Congress 1774-1789*, at 205 (1906) (resolution of March 14, 1776) (recommendation of the Continental Congress that colonies disarm those who were "disaffected to the cause of America" or who had "not associated" with the American government in the war); *see also* Gov. Response Brief, R. 204, at 22 (detailing six laws that followed this recommendation). Prior to passing these laws, many of the colonies had adopted state constitutional provisions similar to the Second Amendment that protected an individual's right to bear arms, *Heller*, 554 U.S. at 601, once again demonstrating an understanding that

---

[7] The government cites pervasive disarmament regulations during this period directed at Native Americans and Blacks. Because these regulations were decidedly discriminatory and unconstitutional by today's standards, and because they were based in the belief that not only were these groups "untrustworthy," but also that they were subhuman, the Court does not place much analytical weight on them.

governments, consistent with the Second Amendment, could restrict firearm ownership based on the perceived untrustworthiness or dangerousness of a group.

### 4. Whether These Analogs Supply a Sufficient Historical Tradition.

These examples were pervasive, and they present a comparable burden and justification as § 922(g)(1) does. Their rationale (social order and respect for the rule of law) matches that of § 922(g)(1) (preventing violence and lawlessness). *See Bruen*, 142 S. Ct. at 2132–33. Johnson argues that these laws are not comparable to § 922(g)(1) because many were discriminatory and evinced a belief that these groups were beneath the rights of citizenship (like religious or racial minorities), or seditious enemies of the state likely to incite rebellion (like dissidents and British loyalists), categories to which Johnson does not belong. It is true that religiously or racially discriminatory laws would be unconstitutional today, that felons are not considered "subhuman" and are in fact part of "the people," and that society is generally not concerned that felons, *en masse*, are likely to incite rebellion. But the overarching reasons for the categorical disarmament laws of the past were to maintain social order and keep firearms out of the hands of groups who were considered dangerous, violent, or untrustworthy adherents to the rule of law. *Kanter*, 919 F.3d at 454 (Barrett, J., dissenting) (historical evidence supports the proposition "that the legislature may disarm those who have demonstrated a proclivity for violence or whose possession of guns would otherwise threaten the public safety"). The government proposes a similar justification for categorically disarming felons under § 922(g)(1) today, that is, that felons are considered dangerous and cannot be trusted

to follow the law and use a firearm safely because they have already disregarded the law in a serious manner. *Id.* at 448–49 ("[P]rohibiting even nonviolent felons . . . from possessing firearms is substantially related to . . . preventing gun violence" because statistics show "a connection between nonviolent offenders . . . and a risk of future violent crime."); *Yancey*, 621 F.3d at 685 ("[M]ost felons are nonviolent, but someone with a felony conviction on his record is more likely than a nonfelon to engage in illegal and violent gun use.").

Johnson also argues that the analogs presented by the government imposed lesser burdens on the right to bear arms because they either provided exceptions or options to regain the right, for example, if the religious minorities swore an oath of allegiance to the government. 1 Wm. & Mary., Sess. 1, ch. 15, in 6 Statutes of the Realm 71 at 72; Robert H. Churchill, *Gun Regulation, the Police Power, and the Right to Keep Arms in Early America*, 25 L. & Hist. Rev. 139, 157 (2007). Johnson therefore argues that § 922(g)(1) is more restrictive than the historical examples because it provides no exceptions and no opportunity for felons to regain their rights.

But like the historical examples, convicted felons today may regain their Second Amendment rights under rare circumstances showing that they can be considered trustworthy members of society. *See United States v. Lloyd*, 184 F.3d 695, 699 (7th Cir. 1999) (Once a felony is expunged, "Illinois law restores all civil rights . . . including the right to carry a firearm."); *cf. Lewis v. United States*, 445 U.S. 55, 63 (1980) (holding there exists no loophole to § 922(g)(1) for collateral constitutional challenges to the underlying felony because the purpose of the statute is to "keep guns

out of the hands of those who have demonstrated that they may not be trusted to possess a firearm without becoming a threat to society" (internal citations omitted)).

In short, the government has supplied a sufficient historical tradition of not only harshly punishing felons with sentences that subsumed disarmament, but also of categorically disarming groups perceived as dangerous. These were not isolated instances, *Atkinson*, 70 F.4th at 1024, but rather, were adopted across time in English common law and the early Republic. They had similar justifications and placed similar burdens on the right to bear arms. The government has thus carried its burden to show that § 922(g)(1) is part of this Nation's historical tradition of firearm regulation.

> **5.  As Applied Challenge: Whether History Supports an Individualized Assessment or a Distinction between Violent and Non-Violent Felonies.**

Johnson also launches an as-applied challenge to § 922(g)(1), arguing that the statute is unconstitutional as applied to him, an alleged "non-violent" felon. First, even if history did support individualized assessments, it may be a step too far for Johnson to categorize himself as "non-violent," given the fact that he has four previous battery arrests and at least one battery conviction on his record. *United States v. Rodriguez-Gomez*, 608 F.3d 969, 974 (7th Cir. 2010) (holding it was not plain error to conclude that the defendant's conviction for aggravated battery was a crime of violence).

Nonetheless, as discussed throughout this opinion, history does not support an individualized assessment of "violent" versus "non-violent" in determining who

should be disarmed, but rather, categorical bans based on membership to a "dangerous" or "untrustworthy" group. And practically, making individualized determinations of dangerousness would be highly subjective and nearly standardless. For example, a person can be violent and yet not have a conviction or arrests on his record involving violence, just as someone convicted of a white collar felony may not be violent but is nonetheless untrustworthy. Such a framework would be unwieldy and create uncertainty, and the Seventh Circuit has repeatedly declined to conduct such as-applied challenges to § 922(g)(1). *Kanter*, 919 F.3d at 443.

In sum, this Court rejects Plaintiff's Second Amendment challenge to his convictions under 18 U.S.C. § 922(g)(1) and finds that § 922(g)(1) does not violate the Second Amendment of the United States Constitution, either generally or as applied to Johnson, under the test mandated by the Supreme Court in *Bruen*.

## II.   Witness Tampering Motion

The Court turns now to Johnson's motion to dismiss the indictment because of allegations of police misconduct. R. 198. Specifically, Johnson contends that Sergeant Jason Edwards interfered with a witness who was a confidential informant ("CI") after the CI offered favorable testimony for Johnson in a suppression hearing.

### a. Background

In March 2022, Johnson called the CI as a witness at a suppression hearing. The CI had previously worked with Sgt. Edwards. The CI testified, among other things, that prior to Johnson's arrest, Sgt. Edwards was harassing him to provide more information despite having fulfilled his obligations as a CI, and that he (the CI)

did not give Edwards any information about Johnson on the day of Johnson's arrest. In deciding the motion to suppress, the Court found the CI's testimony not credible. *See* R. 151 at 7 ("The testimony of the confidential source, who clearly was uncomfortable during his testimony and did not want to come -- did not want to be in court, was not credible.").

On June 1, 2023, in anticipation of the upcoming trial, Sgt. Edwards had a call with the government and FBI Special Agent Prince Prempeh to discuss a Civilian Office of Police Accountability ("COPA") finding. A government discovery disclosure detailed that interview. According to the disclosure, during that conversation, "Sgt. Edwards also stated that he talked to the CI in this case around the time that the CI testified in the suppression litigation. The CI told Sgt. Edwards that Mr. Johnson's wife or girlfriend had contacted him and told him to lie at the suppression hearing. The CI was worried that Mr. Johnson would kill him. Sgt. Edwards also reported that a different confidential source told him that the CI was running a juvenile theft ring near Monticello Ave." R. 198 at 2.

### b. Discussion

The first problem with this motion is that outrageous government conduct is not a cause for dismissing an indictment in this Circuit. *United States v. Smith*, 792 F.3d 760, 768 (7th Cir. 2015) (rejecting defendant's argument that the indictment should be dismissed because government violated his due process rights). Nor is it a recognized defense in this Circuit. *See United States v. Stallworth*, 656 F.3d 721, 730 (7th Cir. 2011); *see also United States v. Duncan*, 896 F.2d 271, 275 (7th Cir. 1990)

(noting that the doctrine's validity was questionable and concluding that the district court did not commit plain error in refusing to recognize an "outrageous governmental conduct" defense). Johnson does not dispute this controlling case law or cite any authority to the contrary.

But even if outrageous government conduct was a proper basis for dismissal, it would not warrant dismissal. There was nothing outrageous here. The disclosure does not state that Sgt. Edwards intimidated or threatened the CI in any manner or that he told the CI to lie or instructed him to testify in any particular way. Nor has Johnson provided an affidavit from the CI or any other evidence to that effect. *Cf. United States v. Smith*, 577 F. Supp. 1232, 1240 (S.D. Ohio 1983) (dismissing the indictment where police officers told witnesses to "tell the truth," and threatened arrest, among other things). Rather, the disclosure raises the possibility of Johnson's significant other attempting to influence the witness's testimony. And the testimony by the CI about Sgt. Edwards' supposed misconduct at the suppression hearing was already found not credible by this Court.

Further, Johnson has not explained how Sgt. Edwards' contact with the CI around the time of the suppression hearing caused him any prejudice. Prejudice of sufficient magnitude to warrant dismissal of an indictment must have or threaten "some adverse effect upon the effectiveness of counsel's representation or [produce] some other prejudice to the defense." *United States v. Morrison*, 449 U.S. 361, 365 (1981). Johnson highlights how Sgt. Edwards' testimony abou the LEADS search was inconsistent with the search data and how Sgt. Edwards did not preserve his text

messages with the CI. But none of those facts speak to what prejudice resulted from Sgt. Edwards' contact with the CI. In addition, the proper way to challenge the claimed weaknesses in Sgt. Edwards' prior testimony is through impeachment, not a dismissal of the indictment.

## CONCLUSION

For the foregoing reasons, Johnson's motions to dismiss the indictment [191, 198] are denied.


ENTERED:


*Thomas M. Durkin*

Honorable Thomas M. Durkin
United States District Judge

Dated: October 12, 2023